UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KRISTINE SCHENK, individually and as dependent administrator of, and on behalf of, STANLEY SCHENK individually, the ESTATE OF NATHAN ALEXANDER SCHENK, and NATHAN ALEXANDER SCHENK'S heirs-at-law; and JENNIFER JACOPS-SCHENK, individually, | § § § § § § § § | CIVIL ACTION NO. _____ |
| Plaintiffs, | § § | JURY DEMANDED |
| v. | § § | |
| CITY OF PASADENA, TEXAS; and RIGOBERTO R. SALDIVAR, | § § § | |
| Defendants. | § § | |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

> **This is a case of a tragic shooting death of a man pursued on foot after being stopped for running a stop sign.  Defendant Officer Saldivar shot Nathan Schenk twice in the back as Nathan tried to flee.  Defendant Saldivar's unreasonable use of force and seizure, and Pasadena's custom, practice, and/or policy, caused Nathan's death.**



Table of Contents

I.     Introductory Allegations .................................................................................3
       A.     Parties....................................................................................................3
       B.     Jurisdiction and Venue..........................................................................5
II.    Factual Allegations .........................................................................................5
       A.     Introduction............................................................................................5
       B.     Shooting Death of Nathan......................................................................6
              1.     Introduction...................................................................................6
              2.     Summary of Incident......................................................................6
              3.     Death Reports.................................................................................7
                     a.     Autopsy – Harris County Institute of Forensic Sciences .........7
                     b.     Death Reporting Form – City of Pasadena ............................12
       C.     Investigation by City of Pasadena.......................................................14
       D.     Officer Saldivar's Knowledge and Education .................................19
       E.     *Monell* Liability of City of Pasadena .................................................22
              1.     Introduction.................................................................................22
              2.     City of Pasadena Policies, Practices, and/or Customs ........................23
              3.     Other Incidents.............................................................................27
III.   Causes of Action ...........................................................................................29
       A.     Remedies and Damages for Violation of Constitutional Rights and/or Other Federal Claims .................................................................................29
       B.     Cause of Action Against Defendant Rigoberto R. Saldivar Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ................................30
       C.     Cause of Action Against City of Pasadena Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ................................................32
IV.    Concluding Allegations and Prayer ..............................................................34
       A.     Conditions Precedent ..........................................................................35
       B.     Use of Documents at Trial or Pretrial Proceedings ..........................35
       C.     Jury Demand ........................................................................................35
       D.     Prayer ..................................................................................................35

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Kristine Schenk ("Kristine Schenk" or "Ms. Schenk") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Kristine Schenk was Nathan Alexander Schenk's biological and legal mother.  Decedent Nathan Alexander Schenk is referred to herein at times as "Mr. Schenk" or "Nathan."  Kristine Schenk sues in her individual capacity and as the Dependent Administrator of the Estate of Nathan Alexander Schenk, Deceased.  Kristine Schenk, when asserting claims in this lawsuit as the Dependent Administrator, does so in that capacity and on behalf of the estate and all of Nathan's heirs  (including Nathan's heirs-at-law, including Kristine Schenk (Nathan's mother) and Stanley Schenk (Nathan's father); and/or Jennifer Jacops-Schenk (Nathan's common-law wife).   All people referenced in the immediately preceding sentence are collectively referred to herein as the "Claimant Heirs."  Kristine Schenk asserts claims on behalf of, and seeks all survival damages and wrongful death damages available to, herself individually and Claimant Heirs.  Kristine Schenk qualified as the estate administrator, in or about November 2020, in a case with Cause Number 485675, in the Probate Court No. 4 of Harris County, Texas, styled *Estate of Nathan Alexander Schenk, Deceased*.

2.      Plaintiff Jennifer Jacops-Schenk ("Jennifer Schenk" or "Ms. Jacops-Schenk") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Jennifer Jacops-Schenk was Nathan Alexander Schenk's common-law wife.  Jennifer Jacops-Schenk and Nathan Alexander Schenk agreed to be married, lived together as husband and wife, and represented themselves as a married couple to other people.  Jennifer-Jacops Schenk sues in

her individual capacity.  Jennifer-Jacobs Schenk asserts claims on behalf of, and seeks all survival damages and wrongful death damages available to, herself individually.

3.     Defendant City of Pasadena, Texas ("Pasadena" or "City of Pasadena") is a Texas incorporated municipality/city.  Pasadena may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer.  The identity of Pasadena's chief executive officer is determined by Pasadena's decision to use the mayor-council form of government.  As a result, Pasadena's chief executive officer is Mayor Jeff Wagner.  Mayor Jeff Wagner may be served with process at Pasadena City Hall, 1149 Ellsworth Drive, Pasadena, Texas 77506, or wherever he may be found.  Pasadena may also be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving it in the manner prescribed by Texas State law for serving a summons or like process (a citation in Texas State courts) on such a Defendant.  Texas Civil Practice and Remedies Code 17.024(b) reads, "In a suit against an incorporated city, town, or village, citation may be served on the mayor, clerk, secretary, or treasurer."  Therefore, Pasadena may also be served with process by serving its clerk, secretary, or treasurer wherever any such person may be found.  Pasadena acted or failed to act at all relevant times, in accordance with its customs, practices, and/or policies, through its policymakers, chief policymakers, employees, agents, representatives, and/or police officers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).

4.     Defendant Rigoberto R. Saldivar (sometimes referred to herein as "Mr. Saldivar" or "Officer Saldivar") is a natural person who resides, is domiciled, and may be served with process at 1201 Davis Street, Pasadena, Texas 77506.  Mr. Saldivar may also be served with process at his place of employment, Pasadena Police Department, 1201 Davis Street, Pasadena, Texas 77506.

Mr. Saldivar may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Saldivar at Mr. Saldivar's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Saldivar is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. Saldivar was employed by City of Pasadena at all such times and acted or failed to act in the course and scope of his duties for City of Pasadena.

### B.       Jurisdiction and Venue

5.       The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to a federal statute providing for the protection of constitutional rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.  The court has personal jurisdiction over City of Pasadena because it is a Texas city.  The court has personal jurisdiction over Officer Saldivar because he resides and is domiciled in, and is a citizen of, Texas.

6.       Venue is proper in the Houston Division of the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Harris County, which is in the Houston division of the United States District Court for the Southern District of Texas.

## II.      Factual Allegations

### A.       Introduction

7.       Plaintiffs provide in the factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs'

allegations, and further demonstrate that Plaintiffs' claim(s) have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have done their best to do so accurately and without any typographical errors.

### B.    Shooting Death of Nathan

#### 1.    Introduction

8.    Nathan was born in 1983, and he was only 34 years old at the time of his tragic and unnecessary death on November 21, 2018 in the City of Pasadena.  Nathan was survived by family members including his mother, father, and wife.  Officer Saldivar's actions and objective unreasonableness, and City of Pasadena's policies, practices, and/or customs, caused, were proximate causes of, and/or were producing causes of Nathan's suffering and death and all other damages sought and/or referenced in this pleading.  Some material facts regarding the shooting death of Nathan are set forth below, in the form of summaries of relevant facts, and information contained in relevant documents and recordings.

#### 2.    Summary of Incident

9.    On November 21, 2018, in the City of Pasadena, Nathan drove a vehicle past a stop sign without stopping.  Officer Saldivar, in a Pasadena police patrol vehicle, pulled Nathan over.  Nathan exited the vehicle and ran.  Officer Saldivar chased Nathan, shooting his Taser at Nathan twice without any prior warning.  Officer Saldivar jumped on Nathan after the second Taser deployment in an attempt to subdue Nathan.  Officer Saldivar said to Nathan, "Mother f****r!." Nathan said, "Don't hit me man. Don't hit me.  Don't hit me."  Officer Saldivar again called Nathan a "mother f****r" while attempting to restrain him on the ground.

10.     Nathan struggled to get away from Officer Saldivar so that he could continue to run away.  Nathan did not strike Officer Saldivar, threaten Officer Saldivar, display a weapon, or threaten any other person.  Nathan's sole goal was to get away from Officer Saldivar after being pulled over.

11.     Officer Saldivar then, without any warning, shot Nathan twice in Nathan's lower back and then once in Nathan's upper chest near his arm pit.  Officer Saldivar did so even though Nathan had extracted himself from Officer Saldivar and was attempting to flee yet again.  Nathan was not suspected of a serious crime, was not threatening anyone or displaying any weapon, and was not a threat to Officer Saldivar's safety or to the safety of any other person in the area.  Nathan simply wanted to get away, and Officer Saldivar shot and killed him.

12.     While Nathan was lying on the ground, dying, Officer Saldivar once again called him a "mother f****r" and a "son of a bitch."  He also said, "Don't you f******g move!  I'll shoot you again!."  He also said, "Don't you damn move!  Don't you f*****g move!"  As Nathan was dying, Nathan said in substance, "I don't have a weapon.  I don't have a gun.  I don't have a weapon."

### 3.     Death Reports

#### a.     Autopsy – Harris County Institute of Forensic Sciences

13.     An autopsy of Nathan's body was conducted the following morning.  The autopsy report is dated November 22, 2018, and the listed cause of death is, "Gunshot wounds of torso."  The listed manner of death is, "Homicide."  The report is signed by Assistant Medical Examiner Hannah C. Jarvis and Deputy Chief Medical Examiner Dwayne A. Wolf.

14.     The report indicates that Nathan was pronounced deceased at 2420 Jana Lane in Pasadena on November 21, 2018 at 7:49 p.m.  The autopsy began at 9:15 a.m. on November 22, 2018, and Detective M. D. Cooper, Pasadena Police, was in attendance.

15.     Nathan's body was described as being 5' 9" long, and 171 pounds.  The report described three gunshot wounds.

16.     The first gunshot wound is referenced by the letter "A."  Even though this portion of this pleading refers to gunshot wounds in a specific order, the medical examiner did not indicate an order of the actual shots.  Gunshot Wound A had an entrance 20 inches below the top of Nathan's head and 6 inches to the left of his body's midline.  There was no stippling or fouling on adjacent skin.  In laypersons' terms, Officer Saldivar shot Nathan in the far left portion of his chest close to his armpit.

17.     The gunshot wound described as Wound "B" had an entrance in Nathan's lower right back, 25 inches below the top of his head, and 3" to the right of Nathan's midline.  Once again, there was no stippling or fouling on adjacent skin.  In laypersons' terms, Officer Saldivar shot Nathan in his lower right back, only approximately 3 inches away from the center of his spine.

18.     The third of three gunshot wounds refenced in the autopsy report was referred to as gunshot Wound "C."  The entrance wound for that shot was in Nathan's mid-left back, 23" below the top of his head, and 4" to the left of his midline.  In laypersons' terms, Officer Saldivar shot Nathan in his lower left back only approximately 4" away from the center of his spine.  The physician's diagram shows these three wounds, with Nathan being shot once near his left armpit and twice in his lower back.

From: SVPITCRFAX2      Page: 13/16      Date: 12/11/2019 3:42:19 PM



Therefore, Officer Saldivar chose to shoot Nathan twice in the back, and once near Nathan's left

side.  This is consistent with Nathan fleeing Officer Saldivar and being shot in the back.  Officer

Saldivar simply chose to shoot Nathan in the back, constitutionally "seizing" and killing Nathan, and thereby violating the United States Constitution.  An x-ray of Nathan's body showed him still handcuffed, which had been done by another officer while Nathan was dying on the ground, with one or more bullets still embedded in his body.



b.      Death Reporting Form – City of Pasadena

19.     As required by law, the City of Pasadena Police Department filed a custodial death report with the Attorney General of Texas.  The report was not drafted until November 29, 2018, over a week after Nathan's death.  Thus, the City of Pasadena Police Department had more than enough time to investigate and collect whatever information it chose to collect before making representations to the Attorney General about how Nathan's death occurred.  Michael Cooper with the Pasadena Police Department drafted and, upon information and belief, filed the report.

20.     The report indicated that Nathan died at 7:49 p.m. on November 21, 2018.  It also admitted that Nathan's death was a homicide resulting from gunshot wounds.  The report describes Officer Saldivar's use of forced as a pre-custodial use of force.  The entire reason for contact with Nathan was listed as "Traffic Violations."   The summary, once again drafted after much information was gleaned in the week following Nathan's death, read in its entirety:

> The LEO stopped the driver of a motor vehicle for traffic violations (Stop Sign).  Before the LEO could inform the driver the reason for the stop, the vehicle driver fled the scene on foot.  The LEO pursued the driver, giving commands to stop.  The LEO deployed his taser, but it had no effect.  [T]he driver continued to flee.  The LEO deployed his taser a second time, causing the driver to fall on the ground.  The LEO jumped onto the driver to subdue him and place him in handcuffs.  The driver resisted, trying to get away from the LEO.  During the struggle, the LEO pulled his service weapon (firearm) and fired at the driver, striking the driver three times.  The driver died at the scene.  No weapon was found on the driver.

This description was generally correct and showed that Officer Saldivar used unconstitutional, unreasonable force and thereby improperly and unconstitutionally seized and killed Nathan.  The portion of the description indicating that Officer Saldivar shot Nathan "[d]uring the struggle" is false.  The struggle had ended, and Nathan was attempting once again to flee when Officer Saldivar shot Nathan twice in the back.  Nathan had not been accused and/or suspected of a serious crime.  Nathan made no statements, movements, and/or threats regarding hurting anyone, and he did not

possess a weapon.   Nathan had asked more than once that Officer Saldivar not hit him. Unfortunately Officer Saldivar chose to do much more.

21.     The report also made the following admissions:

- Decedent Display/Use of Weapons:  No

- Attempt to injury others?:  No

- Make suicidal statements?:  No

- Barricade self or initiate standoff?:  No

- Physically attempt/assault officer(s):  Unknown

- Gain possession of officer's weapon:  No

- Verbally threaten other(s) including law:  No

- Attempt gain possession officer's weapon:  No

Thus, after conducting an investigation for a week, including examining all physical evidence, and including review of dashcam video and bodycam video, the City of Pasadena admitted by the way it completed the custodial death report that Nathan's shooting death was unnecessary, unreasonable, and unconstitutional.

22.     Six (6) months later – on May 28, 2019, the Pasadena Police Department filed an amended custodial death report with the Attorney General of Texas.  After these six (6) additional months to conduct an investigation, the summary portion of the amended report read exactly the same as the summary portion in the initial report (set forth above in a block quotation).  If Pasadena believed that Nathan's shooting death happened in a way other than the way Pasadena described it in the initial custodial death report, it could have re-written that portion of the report.  It chose not to do so, confirming again its general description of the occurrence.  The report also, once again, made the following admissions:

- Decedent Display/Use of Weapons:  No

- Attempt to injury others?:  No

- Make suicidal statements?:  No

- Barricade self or initiate standoff?:  No

- Physically attempt/assault officer(s):  Unknown

- Gain possession of officer's weapon:  No

- Verbally threaten other(s) including law:  No

- Attempt gain possession officer's weapon:  No

C.     Investigation by City of Pasadena

23.     The Pasadena Police Department conducted an investigation of Nathan's shooting death.  That investigation made it clear that Officer Saldivar shot and killed Nathan while Nathan was attempting to flee.  Nevertheless, as indicated elsewhere in this pleading, the Pasadena Police Department apparently took no adverse employment action against Officer Saldivar but instead provided him yet another raise within a few months after Nathan's death.

24.     J. Wright, Assistant Chief of Police, received a memo dated September 19, 2019 from Lieutenant J. M. McGill regarding Nathan's death.  Lieutenant McGill wrote that he had received the completed Internal Affairs Division ("IAD") investigation for review and recommendation.  A portion of the IAD investigator's Summary of Complaint, which was generally accurate (like the summary in the initial and amended custodial death reports referenced elsewhere in this pleading), read:

> On November 21, 2018, at approximately 7:32pm, Officer Saldivar, who was working an overtime traffic assignment (S.T.E.P.), attempted to conduct a traffic stop for a vehicle that failed to stop at a stop sign at the intersection of 6200 Pine Street and 2400 Jana Lane.  The suspect vehicle continued eastbound on Jane Lane, turned southbound of Red Bluff Rd, and finally stopped in the parking lot of Hawk's Bar (4416 Red Bluff).  The suspect then exited the vehicle, failed to follow

commands, and attempted to evade Officer Saldivar.  As he pursued the suspect, Officer Saldivar deployed his Taser twice, which had minimal to no effect.  At the end of the foot pursuit Officer Saldivar struggled with the suspect before drawing his duty weapon, discharging it, and ultimately killing the suspect.  As of this date (August 12, 2019), the Harris County Grand Jury has yet to meet to discuss the outcome of this investigation.  Upon receiving their findings, and administrative supplement will be completed.  Sgt. C.A. Hamilton #1122.

25. The portion of the description indicating that Officer Saldivar struggled with Nathan before Officer Saldivar drew his duty weapon, discharged it, and killed Nathan, is substantially correct, if read literally.  However, the description does not make it clear that Officer Saldivar pulled his duty weapon, and shot Nathan, <u>after</u> the struggle had ceased and Nathan was attempting to flee once again.  Thus, at that time, Nathan was not a danger to Officer Saldivar or others.

26. Lieutenant McGill wrote on Page 3 of his report to Assistant Chief of Police Wright, "The allegation being investigated is listed as, 'Officer Involved Shooting' and the use of deadly force by Officer R. Saldivar."  He further wrote, "After reviewing the information gathered by Sergeant C. A. Hamilton, and regarding the 'Officer Involved Shooting' and the use of deadly force, it is my opinion that Officer R. Saldivar's actions were justified and he should be exonerated of any wrongdoing in this investigation."  Plaintiffs disagree with this conclusion.  The conclusion and facts, as Plaintiffs allege elsewhere in this pleading, show that Officer Saldivar's use of force was consistent with Pasadena policy, practice, and/or custom.

27. Lieutenant McGill further wrote that Officer Saldivar's actions were consistent with certain sections of the Pasadena Police Department's Rules and Policies Manual.  Lieutenant McGill also noted that he came to his conclusion even before the Harris County grand jury concluded its investigation of the shooting.  This is additional evidence that Officer Saldivar, in shooting and killing Nathan, was complying with pre-existing policy, practice, and/or custom of

City of Pasadena Police Department. The IAD document which, upon information and belief, Lieutenant McGill referenced in his report to the Assistant Chief of Police, contained yet another generally correct statement of what occurred:

> In speaking with Detective Cooper, I learned Officer Saldivar was working a Selective Traffic Enforcement Program when he observed a vehicle fail to come to a stop at a stop sign at the intersection of Pine Ave and Jana Ln. After initiating the stop, the vehicle continued traveling to a parking lot located at 4400 Red Bluff (Hawk's Bar). The male driver of the vehicle then exited the vehicle, fled westbound, and was pursued by Officer Saldivar on foot. During the course of the pursuit, Officer Saldivar had used his Taser without effect. At the conclusion of the foot pursuit, Officer Saldivar struggled with the suspect until discharging his weapon multiple times and striking him a minimum of two times, Acadian ambulance #966 had been dispatched to the scene where they pronounced the suspect as deceased at 19:48 p.m.

28.     Once again, the generally accurate City of Pasadena description was inaccurate regarding the timing and manner of Officer Saldivar shooting and killing Nathan. Officer Saldivar was not struggling with Nathan when he discharged his weapon multiple times, shooting Nathan three times. (Upon information and belief, Officer Saldivar shot his handgun more than the three times resulting in Nathan being shot). The struggle had ended before Officer Saldivar chose to shoot and kill Nathan.

29.     It is interesting to say the least that early statements of what occurred were with some exceptions generally consistent with what actually occurred, with some exceptions, based upon the physical evidence, dashcam recording, and bodycam recording. Officer Saldivar's version of what occurred, however, began to change over time. Moreover, Officer Saldivar was afforded something that criminal suspects are not generally afforded voluntarily – quick provision of legal counsel before answering material questions related to killing another human being. Officer Saldivar had legal counsel very quickly after the shooting death, and was thus likely made aware of some standards applying to his conduct as it related to criminal and/or civil liability. In

fact, Officer Saldivar had his counsel present when he discussed with one or more City of Pasadena investigators the shooting death.

30.     Officer Saldivar, while describing certain events in some detail, in a manner that differed from early accounts of what occurred and which are described elsewhere in this pleading, alleged that when he shot and killed Nathan, he "wasn't thinking and it just happened." He said that all he could remember is his gun being in his hand and pulling the trigger. The investigator wrote, "He did not recall what he observed during this time." Officer Saldivar also could not recall taking aim at Nathan. Notably, "Officer Saldivar was allowed to converse with his attorney and subsequently provided his [written] statement." Upon information and belief, Officer Saldivar's alleged failure to recall what occurred and alleged shooting that "just happened" are false. Officer Saldivar did exactly what he intended to do – shoot and kill Nathan. Officers are trained to shoot for center-mass, and when an officer chooses to use his or her duty weapon, he or she shoots to kill.

31.     Sergeant Hamilton's report to J.P. Brugger, Chief of Police, was lengthy. On Page 25, he wrote,

> After viewing videos and comparing them to the affidavit provided by Officer Saldivar, Detective Cooper noted a discrepancy. Officer Saldivar, in his affidavit, stated he "observed the suspect facing me in a standing, but slightly crouched over position (I would describe it as football defensive stance) and he started reaching with his right hand toward his waist line", which is why he fired his service weapon. While viewing the BWC footage, that stance is not observed. Officer Cooper attempted to clarify this with Officer Saldivar, through his attorney, however, did not receive a clarification.

As a result of Detective Cooper's note of discrepancy, Sergeant Brugger contacted Officer Saldivar and requested that he go to the Office of Internal Affairs. Officer Saldivar arrived at the office on January 7, 2018, with his attorney. The interview began at 12:01 p.m. Officer Saldivar, his attorney, IAD Sergeant Bowman, and Sergeant Hamilton were present.

32.     Sergeant Hamilton asked why Officer Saldivar had not delivered any strikes or kicks during the altercation.  Upon information and belief, Sergeant Hamilton knew about a use-of-force continuum, and that more hands-on physical techniques, including strikes and kicks, should have been used long before any lethal force (to the extent any such lethal force was necessary, which Plaintiffs deny).

33.     Sergeant Hamilton also wrote in his report that he followed a line of questioning addressing the discrepancy noted by Detective Cooper between Officer Saldivar's statement and the video recording.  It began with questions about how Officer Saldivar had stated that Nathan arose from the ground in a "football-like" stance while reaching at his waistline for a potential weapon.  The video shows that Nathan appears to be turning or spinning away at that time as opposed to being in the stance alleged by Officer Saldivar.  The investigator also noted that Officer Saldivar's drawing of his weapon was not visible in the video.  He then asked Officer Saldivar to address the discrepancy.  The report reads, "Officer Saldivar responded how he was unsure if he could provide any further information."  Upon information and belief, Officer Saldivar was unsure about providing any additional information, because he knew that his description of the event was false.  He knew that Nathan was attempting to flee yet again, and Officer Saldivar chose to shoot Nathan in the back and, unfortunately, kill him.  Upon information and belief, Officer Saldivar's assertion was made to attempt to protect himself from civil and/or criminal liability.

34.     The report even read, "Officer Saldivar reiterated how he was aware he had shot at the suspect; however, could not recall exact details nor if the rounds fired had struck the suspect. He acknowledged the limited time span in which the incident occurred but he could not 'see anything.'"  Once again, upon information and belief, Officer Saldivar's false assertion was made to attempt to protect himself from civil and/or criminal liability.

35.     During the interview, Sergeant Hamilton said in substance, "And you can tell that he's spinning away and it's after that he's away that the first shots are fired."  Officer Saldivar responds, "Right."  Sergeant Hamilton then says, "So they . . . that's why the, the, the first shots are, in the back which causes him to spin around and hit, hit over here in the side.  M-kay?  Where, um, where the third shot went in."  Officer Saldivar responds, "Right."  Moreover, in addition to shooting Nathan in the back twice first, and then in the other location described in this pleading, Officer Saldivar shot at (and missed) Nathan additional times.  Officer Saldivar admits that the first two shots were into Nathan's back.

36.     Officer Saldivar was also asked why he had not responded to Detective Cooper's additional questions.  Officer Saldivar indicated that the information had been forwarded to his attorney, who advised him not to respond because his original statement was to the best of his recollection.  Upon information and belief, Officer Saldivar was intentionally hiding information which he knew could result not only in criminal prosecution, but clear civil liability for Nathan's death.

D.     Officer Saldivar's Knowledge and Education

37.     Officer Saldivar had sufficient knowledge, training, and/or education to know that his use of force with, and shooting and ultimately seizing and killing Nathan, was objectively unreasonable and violated the United States Constitution.  Officer Saldivar's knowledge and education is demonstrated in part through his licensure as a peace officer and training he received.

38.     The Texas Commission on Law Enforcement ("TCOLE") keeps records of service histories and training and education of the Individual Defendants and which relate to jailer activities.  TCOLE records indicate that Officer Saldivar had sufficient experience and/or education to be fully aware that a failure to act reasonably and appropriately would violate Nathan's rights under the United States Constitution.

39.   TCOLE records indicate the following service history for Officer Saldivar:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer | Pasadena Police Department | Peace Officer License | 09/17/2008 | |
| Peace Officer | Pasadena Police Department | Peace Officer License | 08/14/1998 | 07/29/2007 |
| Peace Officer | Houston I.S.D. Police Dept. | Peace Officer License | 11/27/1995 | 02/27/1998 |
| Reserve Officer | Harris Co. Const. Prct. 2 | Peace Officer License | 03/29/1995 | 11/27/1995 |

40.   TCOLE records indicate the following award history for Officer Saldivar:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Peace Officer License | License | Granted | 04/12/1995 |
| Basic Peace Officer | Certificate | Certification Issued | 04/01/1995 |
| Intermediate Peace Officer | Certificate | Certification Issued | 07/02/2003 |
| Advanced Peace Officer | Certificate | Certification Issued | 07/03/2003 |
| Master Peace Officer | Certificate | Certification Issued | 10/04/2011 |

41.   TCOLE records indicate that Officer Saldivar received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3341 | Police K9 Training | 10/18/19 | 2 | Pasadena Police Academy |
| 8158 | Body Worn Camera | 04/24/18 | 2 | Pasadena Police Academy |
| 4066 | Traumatic and Acquired Brain Injury | 11/08/17 | 4 | Pasadena Police Academy |
| 3841 | Crisis Intervention Training | 11/08/17 | 20 | Pasadena Police Academy |
| 3322 | Patrol Rifle | 12/16/16 | 40 | Pasadena Police Academy |
| 3342 | Tactical Firearms Training | 09/27/16 | 8 | Pasadena Police Academy |
| 3103 | Civil Law | 05/15/15 | 4 | Pasadena Police Academy |
| 2055 | Firearms | 05/13/15 | 4 | Pasadena Police Academy |
| 3922 | Off Duty Encounters | 05/17/13 | 4 | Pasadena Police Academy |

| 56002 | Sudden Custody Death Syndrome TPCT | 05/16/13 | 4 | Pasadena Police Academy |
|---|---|---|---|---|
| 3300 | Patrol/Tactical | 12/14/12 | 4 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 10/25/11 | 2 | Pasadena Police Academy |
| 3800 | Technical / Specialized | 08/09/11 | 16 | Pasadena Police Academy |
| 2055 | Firearms | 06/08/11 | | Pasadena Police Academy |
| 2096 | Arrest, Search & Seizure | 02/17/11 | 8 | Pasadena Police Academy |
| 2096 | Arrest, Search & Seizure | 01/25/11 | 8 | Pasadena Police Academy |
| 3930 | Ethics – General In-Service Training | 01/24/11 | 4 | Pasadena Police Academy |
| 2055 | Firearms | 10/26/10 | 2 | Pasadena Police Academy |
| 3800 | Technical / Specialized | 06/16/10 | 4 | Harris County Sheriff's Academy |
| 3800 | Technical / Specialized | 06/10/20 | 4 | Harris County Sheriff's Academy |
| 3300 | Patrol/Tactical | 09/03/09 | 4 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 08/27/09 | 8 | Pasadena Police Academy |
| 3702 | Field Training Officer | 06/16/06 | 40 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 01/26/06 | 2 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 11/12/04 | 8 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 10/12/04 | 16 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 09/08/04 | 4 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 10/31/03 | 45 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 10/20/03 | 10 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 05/21/03 | 16 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 04/18/03 | 16 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 08/20/02 | 4 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 03/27/02 | 4 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 06/07/01 | 24 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 05/22/01 | 6 | |
| 3300 | Patrol/Tactical | 04/18/01 | 16 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 02/13/01 | 8 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 02/12/01 | 8 | Pasadena Police Academy |
| 2108 | Arrest, Search, and Seizure | 11/29/01 | 24 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 10/13/20 | 16 | Pasadena Police Academy |
| 4001 | Mental Health Officer Training | 01/28/00 | 40 | Pasadena Police Academy |
| 2107 | Use of Force (Intermediate) | 06/08/99 | 16 | Pasadena Police Academy |

| 3300 | Patrol/Tactical | 05/04/99 | 8 | Pasadena Police Academy |
|------|-----------------|----------|-----|-------------------------|
| 1000 | Basic Peace Officer | 08/14/98 | 872 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 8/15/97 | 8 | Pasadena Police Academy |
| 3300 | Patrol/Tactical | 08/14/97 | 8 | Houston Police Academy |
| 3300 | Patrol/Tactical | 07/08/96 | 8 | Harris County Sheriff's Academy |
| 3100 | Law | 06/06/96 | 8 | Texas Municipal Police Association |
| 3300 | Patrol/Tactic | 02/11/96 | 16 | Houston Community College Police Academy |
| 1000 | Basic Peace Officer | 05/31/91 | 540 | Houston Community College Police Academy |

E.      *Monell* Liability of City of Pasadena

        1.      Introduction

42.      Plaintiffs set forth in this section of the pleading additional facts and allegations

supporting liability claims against City of Pasadena pursuant to *Monell v. Department of Soc.*

*Svcs.,* 436 U.S. 658 (1978).  It is Plaintiffs' intent that all facts asserted in this pleading, and not

just the facts and allegations set forth in this section, relating to policies, practices, and/or customs

of City of Pasadena support such *Monell* liability claims.  Such policies, practices, and/or customs

alleged in this pleading were moving forces behind and caused the constitutional violations and

damages and death referenced herein.   Moreover, these policies, practices, and/or customs

operated together to cause the constitutional violations and damages and death referenced in this

pleading.

43.      City of Pasadena knew when Officer Saldivar shot Nathan that its personnel,

policies, practices, and/or customs were such that it could not or would not meet its constitutional

obligations regarding use of force.  City of Pasadena made decisions about policy and practice

which it implemented through its City Council, Chief of Police, and/or through such widespread

practice and/or custom that such practice and/or custom became the policy of City of Pasadena as

it related to use of foce.  The Fifth Circuit Court of Appeals has made it clear that Plaintiff need

not allege at the pleading stage the specific identity of City of Pasadena's chief policymaker, and Plaintiff does not do so.  Plaintiff merely suggests some final policymakers regarding issues in this case, and ultimately relies on the court to make that determination in accordance with Fifth Circuit precedent.

44.     There were policies, practices, and/or customs of City of Pasadena which were moving forces behind, caused, were producing causes of, and/or proximately caused Nathan's suffering and death, and other damages referenced in this pleading.  Pasadena made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when Pasadena implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, physical injury, and/or death.

### 2.     City of Pasadena Policies, Practices, and/or Customs

45.     Plaintiff lists beneath this heading City of Pasadena policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including Nathan's death.  Thus, City of Pasadena is liable for all such damages.

46.     Upon information and belief, Officer Saldivar was not terminated and/or was not the subject of any adverse employment action as a result of Nathan's death and/or events leading up to it.  This is some evidence of pre-existing policy, practice, and/or custom of using excessive force.  In fact, just a few months after Nathan's shooting death, effective April 22, 2019, Officer Saldivar received a raise.  That raise was signed off and approved by Officer Saldivar's department head, Pasadena's human resources department, Pasadena's budget department, and Mayor Wagner.  Officer Saldivar's Performance Evaluation Report, signed by him on January 10, 2019,

in which Officer Saldivar was rated by Sergeant Lebedzinsk, indicated that Officer Saldivar met expectations in eleven separate rating categories, and exceeded expectations in one category – Law Enforcement/Department Knowledge.  The division commander, bureau commander, and Chief of Police all signed off on the evaluation.  The evaluation covered a rating period of July 1, 2018 through December 31, 2018, thus covering the time period when Officer Saldivar shot and killed Nathan.

47.     As a goal, Officer Saldivar was instructed to "continue to maintain his level of professionalism."  Moreover, as opposed to there being any concern at all in the evaluation related to Nathan's death, Officer Saldivar was instead commended for filing three "County Level charges" since mid-April 2018.  While the word "ratification" is often used with factual allegations such as those in this paragraph/section, what constituted the moving force behind damages and death referenced in this pleading was actually pre-existing policy, practice, and/or custom.  City of Pasadena's decision not to terminate or otherwise discipline Officer Saldivar as a result of Nathan's death evidenced unconstitutional pre-existing policy, practice, and/or custom.

48.     Moreover, a City of Pasadena policy, practice, and/or custom of its police officers of concentrating on "production," or assuring that they made a sufficient number of arrests and charge a sufficient number of citizens with crimes, was a moving force behind, caused, and proximately caused damages and death referenced in this pleading.  Upon information and belief, the City of Pasadena Police Department placed an undue focus and emphasis on, and required, its officers to proactively arrest and prosecute people.  Thus, rather than engaging in community policing functions, and exercising appropriate discretion in the field, officers such as Officer Saldivar were pressured to make arrests and prosecute people.  Some evidence of this focus was contained in performance reviews of Officer Saldivar.

49.     For example, a Performance Evaluation Report from September 2017, rating Officer Saldivar, commended Officer Saldivar for "consistently [having] higher production stats than other officers with far less tenure."  In the Additional Considerations section, the rater wrote, "Officer Saldivar filed 12 county level charges during this rating period."  The report was signed not only by Officer Saldivar, but also by a lieutenant reviewer, the Assistant Chief of Police, and the Chief of Police.

50.     Moreover, a July 2015 Performance Evaluation Report of Officer Saldivar, signed by him, a lieutenant, the Assistant Chief of Police, and the Chief of Police, commended Officer Saldivar's "high level of production."  Upon information and belief, production was measured by arrests and/or, more importantly to Pasadena, successful filing of charges and prosecution of citizens.

51.     Another Performance Evaluation Report of Officer Saldivar, in January 2014, lauded Officer Saldivar for his ability to extract citizens from the street and have them prosecuted. That report was signed by Officer Saldivar, a lieutenant, the Assistant Chief of Police, and, upon information and belief, the Chief of Police.   In the Additional Considerations section, then-Detective Saldivar was commended for leading investigations that "resulted in defendants being arrested, charged, and successfully convicted."

52.     As far back as January and February 2005, the City of Pasadena had a policy, practice, and/or custom of commending and motivating officers based on the number of cases they would file and/or the number of arrests they would make.  A Performance Evaluation Report from early 2005, reviewed by the Lieutenant Division Commander, Captain Bureau Commander, Assistant Chief of Police, and Chief of Police, commended Officer Saldivar.  The last typed sentence in the comments section read, "Detective Saldivar had filed twenty-four cases during this

grading period." The underlined portion in the immediately preceding sentence was done by hand, and under it was handwritten, "Keep up the good work Rigo!"  The handwritten comment was initialed by Chief of Police M. R. Massey.

53.     Even approximately 20 years before this suit was filed, the City of Pasadena had this policy, practice, and/or custom.  Officer Saldivar was told in one evaluation that "he could improve in some areas," "although his productivity [had] remained constant through" that year. Another evaluation, in year 2000, indicated that Officer Saldivar's "productivity dropped some during [that] rating period," but was still "at an above average level."  This pressure – productivity – caused and moved Officer Saldivar to pursue, Tase, physically subdue, and ultimately shoot and kill Nathan.  Officer Saldivar, having been with the Pasadena Police Department for many years, knew the culture and expectations of him.  These expectations and culture, practices, and custom caused and/or was a moving force behind Officer Saldivar's action and damages referenced in this pleading.  That attitude began long ago, with Officer Saldivar being commended in mid-1999 because his "enthusiasm [showed] in his daily work with his number of arrests and traffic enforcement."

54.     Further, City of Pasadena's use of force policy, as it related to Nathan's death, was virtually no policy at all and gave little substantive guidance to Officer Saldivar.  The use of force policy indicated the general proposition that City of Pasadena police officers should use only the force reasonably necessary to bring an incident under control, while protecting the life of the officer and others.  It further, provided the nebulous legal statement, "The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances." The policy provides no use-of-force continuum, allowing officers to use various levels of force before moving to deadly force.  The policy then addresses discharging a firearm from and at a

moving vehicle.  It also indicates that officers are not authorized to use deadly force against suspects to prevent consequences of self-imposed injury or suicide, and it also prevents officers from firing warning shots.  The policy addressed chokeholds.  However, in focusing on the use of firearms and chokeholds, and moving vehicles, the policy failed to address at all a foot pursuit and when it would be appropriate to use deadly force.  Thus, allegations in this paragraph/section, caused,  approximately caused, and/or were producing causes of and/or moving forces behind Nathan's death and other damages referenced in this pleading.

55.     Moreover, upon information and belief, City of Pasadena did not have any written policies at all as to use of a Taser outside of its jail.  The City of Pasadena knew that such policies were important and, absent adopting them, to a moral certainty, significant injury and/or death would occur.  Thus, City of Pasadena allowed police officers in the field, such as Officer Saldivar, to have unfettered discretion regarding how and when they used Tasers.  City of Pasadena's failure to have a policy regarding providing a warning before use of a Taser, when a suspect such as Nathan is fleeing, led in this case to damages referenced in this pleading (including Nathan's death).  Office Saldivar shot his Taser at Nathan twice, without providing a warning.  If Officer Saldivar had provided a warning, by, for example, yelling "Taser! Taser! Taser!," or "Stop or I will Tase you!" then Nathan would have had an opportunity to stop and submit to arrest.  Officer Saldivar provided no such warnings as a result of City of Pasadena not having any policy regarding such warnings.  Moreover, upon information and belief, providing such warnings before deploying a Taser at a fleeing person are customary and usual in law enforcement standards across the United States.

### 3.     Other Incidents

56.     Other incidents involving death and/or excessive force used by Pasadena police officers support allegations in this pleading as to City of Pasadena policies, practices, and/or

customs being a moving force behind and/or causing all damages referenced in this pleading. Allegations in this portion of the pleading are made upon information and belief.

57.     On or about November 21, 2005, Barney Green was stopped for a traffic violation by Pasadena police Sergeant Norman.  Sergeant Norman opened the driver door of the vehicle and observed Mr. Green take a drink of water as he was chewing.  Sergeant Norman ordered Mr. Green to place his hands on the steering wheel but, after refusing, Sergeant Norman sprayed Mr. Green in the face with pepper spray.  Mr. Green failed to comply with Sergeant Norman's instruction, so Sergeant Norman drive stunned Mr. Green in the shoulder with a Taser.  Sergeant Norman did it once more, and Mr. Green exited the vehicle and laid flat on his stomach.  When Mr. Green was ordered to spit out whatever he was chewing, Sergeant Norman stunned him with his Taser once again.

58.     On or about July 21, 2007, Pedro Gonzalez, Jr. was attempting to conceal himself in the bed of a pickup truck at a closed mechanic shop parking lot.  Officers observed Mr. Gonzalez to have signs and symptoms consistent with being under the influence of drugs and/or alcohol.  An altercation occurred during an attempt to arrest Mr. Gonzalez.  Mr. Gonzalez was ultimately handcuffed and transported to the Pasadena City jail, instead of directly to a hospital.  Only then did officers ultimately summon an ambulance to the jail.  Ambulance personnel allegedly found Mr. Gonzalez's vital signs to be normal, and Mr. Gonzalez allegedly refused transport to the hospital.  He was then confined in a holding cell.  He passed away, and an autopsy revealed that he had eleven (11) rib fractures on eight ribs, one rib fracture being so significant that it pierced his lung and caused him to bleed internally.  The reporting officer wrote, "It should be noted that due to the deceased age, poor nutrition, and alcoholism, he was more susceptible to broken bones, including ribs."

59.     On or about June 5, 2015, Mark Oswald was arrested for Public Intoxication and transported to the Pasadena City jail.  He was placed into a jail cell.  Several hours later, he was "released from custody" and transported via ambulance to a hospital.  Upon information and belief, the reason that Mr. Oswald was released from custody was that the City of Pasadena did not want to be forced to pay for his medical expenses.  Mr. Oswald's condition did not improve at the hospital, so he was airlifted to a different hospital.  He passed away on or about June 9, 2015.

60.     On or about March 28, 2019, Jamal Ali Shaw was arrested for Public Intoxication Other Than Alcohol.  Once incarcerated at the Pasadena jail, other inmates notified jailers that Mr. Shaw was convulsing on the jail floor.  Jail staff attempted to restrain Mr. Shaw, but he was allegedly combative.  Jailers then Tased Mr. Shaw.  Moreover, upon information and belief, Mr. Shaw was placed into a restraint chair.  Upon information and belief, jailers were aware that Mr. Shaw was having or had had one or more seizures.  Mr. Shaw ultimately passed away, and City of Pasadena, as of late October 2020, had failed to release details regarding the manner and cause of Mr. Shaw's death.

III.     Causes of Action

    A.     Remedies and Damages for Violation of Constitutional Rights and/or Other Federal Claims

61.     The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiffs individually, and for and on behalf of Claimant Heirs, seek, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.

If Nathan had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

> **B.**     Cause of Action Against Defendant Rigoberto R. Saldivar Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

62.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Rigoberto R. Saldivar is liable to Plaintiffs individually and to Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Nathan's rights guaranteed by the United States Constitution, including the 4th Amendment. Officer Saldivar used unreasonable, excessive, and unconstitutional force and unconstitutionally seized and killed Nathan.  Officer Saldivar acted and failed to act under color of state law at all times referenced in this pleading.  Officer Saldivar violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.  Officer Saldivar's actions caused, were proximate causes of, and were producing causes of all injuries, damages, and death referenced in this pleading.  Officer Saldivar is not entitled to qualified immunity.[1]

---

[1]   The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiffs respectfully make a good faith argument for the

63.     Therefore, Nathan's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Officer Saldivar:

- Nathan's conscious physical pain, suffering, and mental anguish;

- Nathan's medical expenses;

- Nathan's funeral expenses; and

- exemplary/punitive damages.

64.     Plaintiffs also individually seek and are entitled to all remedies and damages available to them for 42 U.S.C. § 1983 claims for violation of constitutional rights.  Kristine

---

modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Officer Saldivar cannot show that he would fall within the category of persons referenced in the second sentence of this footnote.  This would be his burden, if he chooses to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring).  Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights.  Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99. *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the Separation Powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

Schenk and Stanley Schenk seek such damages as a result of the wrongful death of their son, and Jennifer Jacops-Schenk seeks such damages as a result of the wrongful death of her husband. Those damages were caused and/or proximately caused by Officer Saldivar.  Therefore, his actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by Plaintiffs and Stanley Schenk individually, for which they individually seek compensation:

- loss of services that they would have received from Nathan;

- expenses for Nathan's funeral;

- past mental anguish and emotional distress suffered by them resulting from and caused by Nathan's death;

- future mental anguish and emotional distress suffered by them resulting from and caused by Nathan's death;

- loss of companionship and society that Kristine Schenk and Stanley Schenk would have received from Nathan;

- loss of companionship and society, and consortium, that Jennifer Jacops-Schenk would have received from Nathan; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Nathan's constitutional rights.  Officer Saldivar's actions showed a reckless or callous disregard of, or indifference to, Nathan's rights and safety.  Moreover, Plaintiffs individually, and also on behalf of Claimant Heirs, seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

C.      Cause of Action Against City of Pasadena Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

65.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Pasadena is liable to Plaintiffs individually and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Nathan's rights guaranteed by the United States Constitution, including the 4th Amendment.

66.     City of Pasadena acted or failed to act, through natural persons including Officer Saldivar, under color of State law at all relevant times.  City of Pasadena's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of Nathan's suffering, damages, and death, and damages suffered by Plaintiffs and Claimant Heirs.

67.     The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the City of Pasadena Chief of Police was the relevant chief policymaker over matters at issue in this case.  Nevertheless, this is just a suggestion as to the relevant chief policymaker.  The court will determine the appropriate chief policymaker at the appropriate time.

68.     City of Pasadena was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.  It also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Nathan's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.  City of Pasadena's policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Nathan.

69.     Therefore, Nathan's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from City of Pasadena:

- Nathan's conscious physical pain, suffering, and mental anguish;

- Nathan's medical expenses; and

- Nathan's funeral expenses.

70.     Plaintiffs also individually seek and are entitled to all remedies and damages available to them for 42 U.S.C. § 1983 claims for violation of constitutional rights.  Kristine Schenk and Stanley Schenk seek such damages as the result of the wrongful death of their son, and Jennifer Jacops-Schenk seeks such damages as a result of the wrongful death of her husband. City of Pasadena's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by Plaintiffs and Stanley Schenk, for which they individually seek compensation:

- loss of services that they would have received from Nathan;

- expenses for Nathan's funeral;

- past mental anguish and emotional distress suffered by them resulting from and caused by Nathan's death;

- future mental anguish and emotional distress suffered by them resulting from and caused by Nathan's death;

- loss of companionship and society Kristine Schenk and Stanley Schenk would have received from Nathan; and

- loss of companionship in society, and consortium, that Jennifer Jacops-Schenk would have received from Nathan.

Moreover, Plaintiffs individually, and on behalf of Claimant Heirs, seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.     Concluding Allegations and Prayer

### A.       Conditions Precedent

71.     All conditions precedent to assertion of all claims herein have occurred.

### B.       Use of Documents at Trial or Pretrial Proceedings

72.     Plaintiffs and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

### C.       Jury Demand

73.     Plaintiffs and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

### D.       Prayer

74.     For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs (Kristine Schenk and Jennifer Jacops-Schenk) and Claimant Heirs (Kristine Schenk and Stanley Schenk, and/or Jennifer Jacops-Schenk) have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)      actual damages of and for Kristine Schenk, individually and as administrator of the referenced estate, and for Jennifer Jacops-Schenk and Stanley Schenk individually, including but not necessarily limited to:

•       loss of services that they would have received from Nathan;

•       medical expenses for Nathan;

•       expenses for Nathan's funeral;

•       their past mental anguish and emotional distress resulting from and caused by Nathan's death;

•       their future mental anguish and emotional distress resulting from and caused by Nathan's death;

- Nathan's conscious physical pain, suffering, and mental anguish;

- Plaintiffs' and Stanley Schenk's loss of companionship and society they would have received from Nathan; and

- Jennifer Jacops-Schenk's loss of consortium;

b) exemplary/punitive damages for Plaintiffs and Claimant Heirs from Officer Saldivar;

c) reasonable and necessary attorneys' fees for Plaintiffs and Claimant Heirs, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d) court costs and all other recoverable costs;

e) prejudgment and postjudgment interest at the highest allowable rates; and

f) all other relief, legal and equitable, general and special, to which Plaintiffs and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


    /s/ T. Dean Malone
    T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Southern District of Texas Bar No. 37991
Kristen Leigh Homyk
Texas State Bar No. 24032433
Southern District of Texas Bar No. 3513488
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:         (214) 670-9904


Attorneys for Plaintiffs